If it may please the Court, my name is Feng Li, and I'm representing the Petitioner, Mr. Sargon Shabbaz Ginze. If you're going to help us a little more, if you can speak up. It's a little hard to hear. Thank you. Certainly, Your Honor. In this case, the substantial evidence does not support the IJ's finding that Mr. Ginze was firmly resettled in Germany. I think what's important to notice here is the timing of the IJ's decision to preterminate Mr. Ginze's asylum application. If you turn to page 100 of the record, the IJ pretermined this application at the very beginning of the mayor's hearing, before any testimony has been taken in this case. Therefore, the only evidence in the record that even discusses Mr. Ginze's stay in Germany show the exact opposite, that he's only there as a temporary refugee. If you turn to page 490, in our motion to oppose the government's motion to preterminate the application, Mr. Ginze submitted an affidavit. He acknowledged that he was granted asylum in Germany, but it wasn't permanent residency. It was he was simply there as a temporary refugee. He was never offered permanent residency, and he wasn't eligible to become a German citizen. And he again repeats this in his declaration that he submitted on page 271, where he says that he's only there as a temporary refugee. He applied for temporary refugee status in Germany. On page 271 of the record, after he fled Iran and went to Germany, he applied for temporary refugee status, where he stayed for five years. And after he got a travel document, he immediately fled to the U.S. So at the time the IJ made this decision to preterminate the application, there was nothing in the record that said that Ginze was there in Germany as a permanent resident. Although there is alternative findings here, right, in terms of if that is not successful, there's also a determination that there's no basis for asylum because of the credibility? Yes. And to address the credibility issue, here the IJ does find him not credible, but the IJ basically isolates immaterial parts of his claim to support her or support his adverse credibility finding. The IJ singles out two instances. One is in 1984, and one is in 1990. With respect to his 1984 arrest, Mr. Ginze in his declaration has stated that after this was post-Islamic Revolution Iran, the Iranian government had just shut down Assyrian schools, and Mr. Ginze and like-minded Assyrians had banded together to try to reopen the schools. And so he testified about how he was arrested by the Hezbollah and how he was detained for 15 days. Now the IJ believes that Mr. Ginze is not credible because in his declaration, he didn't mention that he was whipped with a cable. But this is not inconsistent because what his declaration actually says, and you see this on 269, is that he was subject to a lengthy period of interrogation. And that his interrogator said, I'm going to do something to you that you'll never forget. Now that's merely a somewhat vague statement, but that's the point of having testimony at a marriage hearing, to flesh out this. Excuse me? Difficulty the IJ had is that doesn't appear anywhere. He goes through his papers. He goes through the one that is, I think it's his sister-in-law, translates for him. He never tells anybody anything about being beaten with a cable, and then it just shows up. So what is his basis for saying that can't be a legitimate adverse credibility finding? Yes, Your Honor. Well, in his previous declarations, he had stated that those were incomplete or those were, he didn't list all his statements. And even before he submitted his assignment application in the U.S., if you look on page 298 of the record, and this is when he was still in Germany, he said that those assignment applications are incomplete because they were interview, translation errors, or they didn't write down all his statements. And again- So that's his explanation is that they're incomplete because they're incomplete? Because we don't know under what conditions they wrote it down. But also in his declaration, he didn't mention that he was interrogated. And so the next natural question to ask is, well, when you're interrogated, what do you mean? And that's what's asked at his, at the regular hearing. And you see this on page 111 and 112, where when he's asked about what happened to him, he explained that he was hit and he was hit with a cable. So he just simply never had the opportunity to explain what he meant before that. And with respect to the 1990 arrest, the IG believes that this is also a material inconsistency, because apparently it was never mentioned before. And it's unclear whether Mr. Ginze knew the British man he gave the aspirin to. But as Mr. Ginze explained, he gave an aspirin to a Kurdish man that he had known at a tea cafe, not literally as best friends, but it's just someone that he had seen throughout the years as he had visited that little city on the border of Turkey and Iran. But the IG instead takes it, isolates that claim and keeps asking him, well, what do you mean by you knew him? Did you know him, know him, or did you know him? But I think the reasonable explanation is that this is just someone that he had a passing familiarity with. Could you say something about his religion? He's described as an Assyrian Christian. I didn't know what that meant. Yes, Your Honor. As I understand, Assyrian is just his race. But his claim is based on him being a Christian in Iran, in post, and this is after 1979, after the Islamic Revolution. He's a Christian. What does Assyrian mean? I think that's his race, or his ethnicity. You think it's what? It's his ethnicity. And I'd like to reserve the rest of my time for rebuttal, Your Honor. All right. May. Good morning again, Your Honors. Again, I'm Jonathan Robbins here on behalf of Eric Holder, the respondent. I think it's important in this case to get a good idea of what exactly the process was that he went through during these different declarations and ultimately the claim that's now before the court. When he initially left Iran, he applied for asylum status in Germany and was granted asylum status. That's not in dispute. While he was in Germany, he applied for asylum in the United States from Germany, twice. There was the initial application and a motion to reconsider that, the denial of that asylum application. Nowhere in that documentation, either with Germany or in his applications for the United States, was there any mention of being tortured or beaten. Now, he does say that he was a forceress. He says there was a long process of interrogation, but no interrogation. Doesn't mention anything about that in all of the documentation five years leading up to this case. Then, as you know, he decides, despite the fact that he knows the United States government's inclination, at least to his initial asylum application from Germany, he decides to take his chances. He comes to the United States on a tourist visa and overstays that visa. And then all of a sudden, for the first time in his last chance at asylum, all of a sudden for the first time, we get this new story about being tortured and beaten and all of these things. Now, logic would seem to dictate that if you were applying for asylum, whether it's in Germany or for the first time while you're in Germany to the United States, that would be one of the first things you mention is being beaten. But again, this doesn't come up until five years after the fact for the first time. Now, that is a relatively sound basis for an immigration judge to say, that's an omission in your previous documentation that's all of a sudden coming up for the first time, and that is certainly a sound basis for an adverse credibility finding. Now, ultimately, I don't think the court has to get to the credibility issue, because I think it seems pretty clear, based on the evidence, that he was firmly resettled in Germany. I mean, these are the facts as they relate to firm resettlement. It's undisputed that he was granted asylum in Germany. It's undisputed that he got work and housing in Germany. He got travel documentation in Germany. He stayed there for five years. I mean, if that's not enough to shift the burden to the alien to show that he's not firmly resettled in Germany, I- The question, let me ask you about this. It seemed like all of those criteria were met, and then the burden would shift to him. And he had this declaration that said, well, really, I may live in Germany and have asylum, but I get restricted housing. I don't, I have a lot of problems in terms of integration and the Nazi problem, etc. But he wasn't actually permitted to make that argument? He was permitted to make that argument. With that declaration? Well, bear in mind that the immigration judge continued the case for three months, so both sides could submit motions specifically on the firm resettlement issue. So, I mean, at the beginning of the merits hearing, he made a ruling on those motions, which they had all the time to submit evidence, and he made a motion saying, I'm finding that there's a finding of firm resettlement here. You spent five years in a place where they granted you asylum. I mean, what is the argument here, that the German government is going to send him back to Iran after granting him asylum? I'm not really sure. So his, the final determination was made after it had the continuance and after it had the chance to add additional information? Yes, I think the time frame was three months. I'd have to check the record. But they had a significant amount of time to prepare their arguments on the firm resettlement issue. So, I mean, he had a chance to present his claim in that regard. And again, the presumption shifting, all this evidence, grant of asylum, all the benefits that he received from the German government. I know he claims that he was substantially restricted. He said the housing was overcrowded. Well, if you're getting government housing, it may be overcrowded. That's not substantial restriction of your rights in Germany. I mean, it's clear that they put him on a path to refugee status. And when he came to the United States and allowed his travel documentation to expire, that doesn't mean that they didn't offer him permanent resettlement. He allowed his travel documentation to expire. In other words, forfeited that refugee status. That's no different than the United States. That you can be granted status in the United States and end up forfeiting that status. Do you know now if he were deported, would he be deported to Iran or to Germany? The order of removal from the immigration judge states that it would be Iran, yes. Because he's given up his German. Well, according to the document. Oh, because he would come from the country on which he's claimed from? Yes. All right. So, and again, getting back to the credibility, with respect to the problem, one of the problems that the immigration judge noted out is that in his declaration of 2003, he stated that the reason he was arrested in his third arrest was because he gave an aspirin to somebody that he knew. And then during testimony, when asked whether he knew this person, he said, no, I didn't know this person. You've got to admit, that's a pretty irrelevant detail. I mean, the whole incident doesn't amount to anything. Well, respectfully, it does amount to something. He is setting forth this next arrest, or at least the story of this next arrest, to bolster his claim that he's being persecuted in Iran. I don't see how that's essential. I mean, it's just a sort of a mindless incident. I couldn't see anything that would get thrown one way or the other. If it was standing alone. What? If it was standing alone, that specific fact, I'd say, yeah, it might be pretty weak, but when you combine that with the fact that all of a sudden there's new allegations that were being made for the first time. And the tort, the not mentioning torture in all your previous asylum applications until this final one, that goes directly to the core of his claim. That's as significant as it gets. I mean, if your logic would dictate that if you're applying for asylum in other countries, and I'm talking about prior to the claim that's before the court today, wouldn't the first thing you mentioned be that you were beaten and tortured? I mean, nowhere is there any indication of that in his documentation, and that's a problem. That is an omission that is as sound a basis for an adverse credibility finding as you can find. And certainly the record doesn't compel a contrary conclusion to that. Is it plausible that he just decided not to mention an entire instance of torture and beating in his previous applications? It's possible, but is it also possible that this new allegation of persecution is coming up in his last gasp effort to apply for asylum where he's already been previously, that's also possible, and one conclusion isn't compelled over the other. So with that, we would respectfully request that the court deny the petition for review and uphold the board's decision. Thank you very much for your time, Your Honor. Thank you. I think you have a short amount of rebuttal time left. Thank you, Your Honor. First of all, with respect to the 1984 arrest and the mention about the cable, I think what's also important to note is why the judge feels it's so important that Mr. Ginzey didn't specifically mention the cable in the first place. The judge's reasoning is that this fact, if true, it's material because it would make his case substantially stronger. Now, that's not the point. The point is whether, given the totality of his persecution in Iran, whether he qualifies for asylum. And for the firm resettlement issue, again, it's important to note when the judge decided to pre-submit the asylum application, finding firm resettlement. Although the second IJA did give us time to submit motions and arguments, as the IJA notes on page 89 of the record, motions aren't evidence, they're just arguments. Now, the evidence in this case, like most asylum cases, would be the person's testimony. But since the IJA prevents him from ever testifying in the first place, then, and you see this on page 100 when the judge pre-submits the application, and we also ask if we are allowed to present testimony about his living conditions in Germany. And you see this on pages 100 and 101, the IJA says no. I already have his statements in his declaration and in his affidavit. And later on, towards the end of his direct testimony, when the petitioner's counsel asked him, when you were in Germany, did the German government offer you any other sort of status besides refugee status, any permanent residency, the government objects, saying that this issue has already been decided. And that's on page 127. So since Mr. Ginzey wasn't allowed to testify about his time in Germany, and the only evidence in the record at the time the IJA made this factual determination was Mr. Ginzey's affidavit and his declaration, they both state that he was only there as a temporary refugee and not as a permanent resident. So the IJA should have taken that into account. So based on the evidence, Your Honor, we request that you reverse the IJA's firm resettlement finding and find Mr. Ginzey eligible for asylum. And I'm I'd like to ask you about the first application is written by his German lawyer and says he was slapped, not whipped. Now, isn't that an inconsistency? It appears so, Your Honor, except that these applications seem incomplete. We have little Now, wait a minute. It's not incomplete. It distinguishes being whipped from being slapped. And now you could say maybe the German got it wrong, but that's the way it is. He says I was slapped, not whipped. Yes, Your Honor. It is an inconsistency. It may be an inconsistency, but Maybe is. I mean, slapping and whipping are different things. Now, you can say, well, maybe the German didn't know the difference, but that's in the letter. Yes, Your Honor. But at his interrogation, he was still beaten by his interrogators. He was what? He was still beaten by his interrogators. So. Beaten? Well, of course, we have to we speak of persecution as being severe. Now, you didn't argue at all being put in a labor camp was severe. That was a way of arguing. Oh, that's what I meant by the totality, Your Honor. Even given his 1984 arrest, he was sent to the labor camps with Iran and Iraq. He was also he was forced to work 15 hours a day. He wasn't allowed to even sit near the other Muslims because he was considered unholy and unclean as a Christian that wouldn't convert to Islam. And also in 1989, he's working for the government and he's almost killed because his car is pushed off a cliff. There's a whole series of events. And also in 1988, when he's he's arrested for protesting the closing of private Christian schools as well. So and he's detained by the army for 45 days. So he suffered a long, a long period of persecution, not just that one incident. Thank you. The case of Ginza versus Holder is submitted.
judges: Noonan, McKeown, Archer